IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

TERRENCE SMITH,

             Plaintiff,

     v.

DET. MATTHEW MERCURI and
RESERVE OFFICER CAMERON LUNG,
#9067

             Defendants.

HONORABLE ROBERT B. KUGLER

Civil Action
No. 17-1278 (RBK/KMW)

**OPINION**

APPEARANCES:

Derek A. Steenson, Esq.
1500 Walnut Street, #700
Philadelphia, PA 19102
    Attorney for Plaintiff

Matthew B. Wieliczko, Esq.
Dean R. Wittman, Esq.
ZELLER & WIELICZKO, LLP
120 Haddontowne Court
Cherry Hill, NJ 08034
    Attorneys for Defendant, Matthew Mercuri

J. Brooks DiDonato, Esq.
PARKER MCCAY P.A.
9000 Midlantic Drive, Suite 300
P.O. Box 5054
Mount Laurel, NJ 08054
    Attorney for Defendant, Cameron Lung

**KUGLER,** District Judge:

## I. INTRODUCTION

Plaintiff Terrence Smith ("Plaintiff") filed suit against the City of Burlington City and several Burlington City Police Department ("BCPD") officers – Detective Matthew Mercuri

("Detective Mercuri" or "Mercuri"), Reserve Officer Cameron Lung ("Officer Lung" or "Lung"), and Officer Stephen Hesson ("Officer Hesson" or "Hesson") – following an incident that occurred on February 23, 2015 at the Burlington Supermarket (hereinafter, "the Market"). In short, Plaintiff claims that, while he was waiting for a delivery truck to arrive at the Market, several BCPD officers conducted an illegal pat-down search of him; that a struggle ensued wherein the officers unnecessarily tripped Plaintiff and tackled him to the ground; and that one officer unlawfully deployed a K-9 while Plaintiff was on the ground with two other officers on top of him, and then again while Plaintiff was inside the Market. As summarized below, surveillance video and audio captures almost the entire encounter.

Plaintiff initially brought claims against Defendants City of Burlington, Mercuri, Lung, and Hesson for the alleged deprivation of various constitutional rights. All allegations against Defendants City of Burlington County and Hesson were subsequently dismissed, leaving only Defendants Mercuri and Lung remaining in the case. Currently pending before the Court are motions for summary judgment filed by those remaining Defendants. For the reasons set forth below, Defendant Mercuri's motion will be denied in part and granted in part, while Defendant Lung's motion will be granted in its entirety.

## II. BACKGROUND

### A. Factual Background[1]

The Court begins with the summary judgment record. On February 23, 2015, at approximately 11:02 a.m., the Burlington City Police Department received an anonymous call reporting that a tall, skinny black male wearing a black coat was selling drugs at the Burlington Supermarket. (Case Report [Docket Item 31, Ex. A] at 23.) Detective Mercuri and his K-9 partner, Max, were dispatched to the Market to investigate the call, along with Officer Lung. (Id.; Lung Dep. [Docket Item 31, Ex. N] at 8:12-9:5.)

The incident in question was captured via a surveillance video (without audio) inside the Market (hereinafter, "Market Video").[2] The Market Video depicts the entrance of the Market, from inside the Market, including a view of the sidewalk through the glass doors and windows. In addition, Officer Lung's Mobile Video Recorder (hereinafter, "Lung MVR") provided audio of the

---

[1]  For purposes of the instant motion and pursuant to Local Civil Rule 56.1, the Court looks to the Complaint [Docket Item 1] when appropriate, the Defendants' Statement of Undisputed Material Facts ("SUMF") [Docket Item 32-1; Docket Item 46-4], Plaintiff's Responses to Statement of Material Facts ("RSMF") [Docket Item 32-1; Docket Item 50-7], and related exhibits and documents.

[2]  The summary judgment record below contains information from both the Market Video and Lung MVR, presented chronologically, by looking at each source, concurrently. The Court notes that the time stamp on the Market Video does not reflect the actual time on the day of the incident, but the Lung MVR does. Accordingly, the time shown in the Market Video and the Lung MVR do not match up.

interaction between Plaintiff and the officers. The Lung MVR also contains video of the street, including a view of Detective Mercuri's police vehicle.

Plaintiff testified that, on the morning of February 23, 2015, he was working under the table at the Market and playing lottery tickets while waiting for a delivery truck to arrive. (Smith Dep. [Docket Item 31, at Ex. O] at 23:1-25.) At the time, he was 6 feet, 7 inches tall, and weighed approximately 225 to 230 pounds. (Id. at 70:21-71:13.)

The surveillance video shows Plaintiff standing in the front of the store prior to the incident. (Market Video [Docket Item 31, Ex. M] at 12:00:00-12:10:15.) Detective Mercuri first enters the store and asks Plaintiff to step out onto the sidewalk to answer some questions. (Id. at 12:10:15.) While outside, Detective Mercuri can be heard telling Plaintiff that "someone called about you selling drugs." (Lung MVR at 11:13:30-11:13:34.) Shortly thereafter, Detective Mercuri can be heard telling Plaintiff that he is going to do a pat-down and asking if Plaintiff has any weapons. (Lung MVR at 11:13:40-11:13:46.)

Surveillance video shows Plaintiff turning around, facing the Market, and allowing Detective Mercuri to perform a pat-down search. (Market Video at 12:11:10.) It is difficult to see where Detective Mercuri's hands are throughout the pat-down; however, at one point, Detective Mercuri's hand can be seen grabbing

Plaintiff's front left pants pocket. (Id. at 12:11:24.) Plaintiff alleges that at this time, Detective Mercuri squeezed and manipulated his pocket approximately four times. (Compl. [Docket Item 1] at ¶ 25.) Detective Mercuri can be heard asking about the contents of Plaintiff's pocket and instructing Officer Lung to conduct a further search. (Lung MVR at 11:14:00–11:14:06.) Plaintiff then turns around and faces the officers. (Market Video at 12:11:32.) Plaintiff testified that he turned around because he believed that the officers were "going beyond a pat-down." (Smith Dep. at 34:16-19.) By this time, Officer Hesson had arrived and joined the other officers. (See Market Video at 12:11:32.) Plaintiff can be heard questioning the officers regarding the search of his pocket and whether they have permission to do so. (Lung MVR at 11:14:08–11:14:12.)

Detective Mercuri and Officer Hesson are then seen grabbing Plaintiff's arms. (Market Video at 12:11:35.) Plaintiff can be heard continuing to express concern about the search. (Lung MVR at 11:14:12–11:14:18.) Plaintiff testified that he was asking the officers why they were "gripping" him. (Smith Dep. at 36:5-12.) Plaintiff can be seen brushing Officer Lung's hand away from searching his pocket. (Market Video at 12:11:40.) Plaintiff and the officers can be heard arguing throughout this encounter. (Lung MVR at 11:14:18–11:14:32.)

Plaintiff then steps toward the officers again and Officer Hesson moves in behind Plaintiff. (Market Video at 12:11:49.) Immediately thereafter, a skirmish begins. (Id. at 12:11:50.) Plaintiff can initially be seen struggling, as all three officers grab hold of him. (Id.) Plaintiff testified that, prior to this encounter, the officers did not tell him he was under arrest. (Smith Dep. at 17-19.) Later in his deposition, Plaintiff testified that, at the start of the struggle, he asked the officers to take their hands off of him. (Id. at 86:6-12.)

Soon after the clash begins, Plaintiff and the officers move a few feet away from the store, but Plaintiff quickly walks away, pulling the group of officers back toward the doorway of the Market. (Market Video at 12:11:54.) Plaintiff testified about this moment:

> Q. So what does the video depict at this point? This is at 12:11:54.
>
> A. In my mind I thought they were trying to pull me into the alley.
>
> Q. What were they trying to pull you into the alley to do?
>
> A. I don't know. Like, I don't think if it would have got prettier if I was in the alley versus where I pulled them at into the store. So my whole state of thought was I need to stay in the view of the camera like. I need to be where – if something bad is going to happen beyond this that it can be seen.

(Smith Dep. at 38:3-15.) Detective Mercuri then releases his grip and breaks away from the struggle. (Market Video at 12:11:59.)

Plaintiff, Officer Lung, and Officer Hesson move into the threshold of the Market. (Id. at 12:12:00.) Plaintiff testified that he "wasn't trying to get away" at this time. (Smith Dep. at 39:16-22.) Rather, Plaintiff again testified, it was his intention to get into the store to avoid being taken into the alley by the officers and out of sight of the video camera. (Id.)

Plaintiff can then be seen being pulled from inside the Market and tackled to the ground by Officers Lung and Hesson. (Market Video at 12:12:02.) The view of Plaintiff and Officer Lung is largely obstructed once on the men are on the ground. (Id. at 12:12:05-12:12:14.) Plaintiff ultimately manages to force his way back onto his feet and drag the officers back toward the Market's doors. (Id. at 12:12:15.) The officers then tackle Plaintiff so that he is partially inside the Market with his legs on the outdoor sidewalk. (Id. at 12:12:17.)

While this struggle ensued, Detective Mercuri returned to his police vehicle and retrieved the K-9. (Lung MVR at 11:14:41-11:14:53.) The K-9 exited the car and ran toward the scene, without a leash, as Detective Mercuri followed behind. (Id. at 11:14:53-11:14:56.) The K-9 arrives on the scene and first bites Officer Lung, who, along with Officer Hesson, was on top of Plaintiff. (Market Video at 12:12:19.) The K-9 quickly withdraws and returns to Detective Mercuri. (Id. at 12:12:19-12:12:21) Plaintiff then gets back on his feet inside the Market. (Id. at 12:12:24.)

While inside the Market, Officer Lung grabs Plaintiff. (Id. at 12:12:24-12:12:30.) He then releases his grip on Plaintiff and Detective Mercuri deploys the K-9 once again. (Id. at 12:12:31.) At this time, Officer Hesson can be seen grabbing Plaintiff's shirt while the K-9 bites Plaintiff's leg. (Id.) Plaintiff can be seen holding his arms out. (Id. at 12:12:38-12:12:42.) The K-9 continues to bite Plaintiff's leg, on and off for several seconds, until Plaintiff falls to the ground. (Id. at 12:12:42.) Plaintiff was subsequently handcuffed by Officers Lung and Hesson.[3] (Mercuri Narrative [Docket Item 46, Ex. A] at 2.)

Plaintiff was then taken to the hospital under police custody. (Smith Dep. at 63:6-25.) Plaintiff testified he had bite marks on his ankle and leg following the encounter and that he still has scars. (Id. at 64:12-17, 66:9-10.) Plaintiff further states that he has occasional pain in his ribs, which manifests itself approximately twice a month. (Id. at 66:5-66:4.) In addition, Plaintiff claims that he is unable to play basketball like he used to. (Id. at 66:16-23.) As of the time of his deposition, Plaintiff worked at the Bordentown Inn performing maintenance duties and cooking. (Id. at 67:1-68:25.)

---

[3] Plaintiff testified that he was kicked at some point during the struggle but could not identify the officer responsible, the exact number of kicks, or when it occurred. (Smith Dep. at 55:20-56:6.) For its part, the Court has been unable to identify any kicks in the video surveillance.

After Plaintiff was removed from the scene, another officer returned to the Market to view the surveillance footage. (Mercuri Narrative at 2.) According to officers, the video revealed that Plaintiff threw an object behind the shelves during the incident.[4] (Id.) Several officers searched the area and found a plastic sandwich bag with eight individually wrapped packets of marijuana. (Id.)

Detective Mercuri later prepared an Affidavit of Probable Cause. (Aff. of Probable Cause [Docket Item 31, Ex. C] at 10.) Plaintiff was initially charged in Superior Court of New Jersey, Burlington County, Criminal Part, with Aggravated Assault on Police, Distribution of Marijuana, Resisting Arrest, Possession of Marijuana, and Possession of CDS Paraphernalia. (Id. at 6-9.) Plaintiff was then indicted by a grand jury on charges of Resisting Arrest (Third Degree) and Aggravated Assault of a Law Enforcement Officer. (Grand Jury Indictment [Docket Item 31, Ex. F] at 11-12.) Plaintiff subsequently pled guilty to a disorderly person's offense for loitering. (Transcript of Trial, New Jersey v. Smith, Indictment No. 15-07-7071 (N.J. Super. Ct. Apr. 26, 2016) [Docket Item 31, Ex. L] at 24:1-29:15.) In April 2016, he was tried before

---

[4]     Defendants in their briefs do not reference a specific point in the Market Video when this occurred, and the Court was unable to independently confirm this account.

a Burlington County jury on the Resisting Arrest charge, and was found not guilty. (Id. at 21:1.)

**B.  Procedural History**

On February 23, 2017, Plaintiff filed a Complaint in the U.S. District Court for the District of New Jersey naming as Defendants the City of Burlington, Detective Mercuri, Officer Lung, and Officer Hesson. [Docket Item 1.] Count Three of the Complaint was later dismissed by stipulation between the parties. [Docket Item 18.] All claims asserted against Defendants Hesson and the City of Burlington were also dismissed by stipulation, pursuant to Fed. R. Civ. P. 41(a). [Docket Items 55 & 56.]

The remaining Counts against Defendants Mercuri and Lung are as follows: (1) violation of the Fourth and Fourteenth Amendments of the U.S. Constitution under 42 U.S.C. § 1983 (Count One); and (2) violation of the New Jersey Constitution and New Jersey Civil Rights Act, N.J.S.A. § 10:6-2 (Count Two). (Compl. at ¶¶ 45-49.) Specifically, Plaintiff alleges under each Count that he was: deprived of the right to be free from unlawful detention; subjected to an unlawful search and seizure; subjected to an excessive use of force; deprived of the right to be secure in one's person and property; deprived of the right to be free from malicious prosecution; and deprived of his right to due process of law.[5]

_____

[5]  Plaintiff and Officer Lung agree that the malicious prosecution claims should be dismissed as to Officer Lung because

(Id.) To the extent possible, the Court addresses these poorly-plead categories of constitutional claims separately below.

After discovery was completed, Defendants Lung and Mercuri filed the pending motions for summary judgment. [Docket Items 31 & 46.] Plaintiff timely opposed both motions [Docket Items 32 & 50], and both Defendants filed reply briefs. [Docket Items 39 & 57.] The summary judgment motions are now fully briefed and ripe for disposition. The Court decides these motions without oral argument pursuant to Fed. R. Civ. P. 78.

## III. STANDARD OF REVIEW

At summary judgment, the moving party bears the initial burden of demonstrating that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once a properly supported motion for summary judgment is made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). In reviewing a motion for summary judgment, the court is required to examine the evidence in light most favorable to the non-moving party, and resolve all reasonable inferences in

---

he did not initiate the prosecution of the plaintiff. (Pl.'s Opp'n Br. [Docket Item 32] at 4.)

that party's favor. Scott v. Harris, 550 U.S. 372, 378 (2007); Halsey v. Pfeiffer, 750 F.3d 273, 287 (3d Cir. 2014).

The fact that this case includes surveillance video footage presents an "added wrinkle" to the usual standard which requires courts "to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" Scott, 550 U.S. at 378. Where there is video footage related to the claims, the Court will not draw inferences that are "blatantly" inconsistent with the video evidence. See id. at 380–81 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment . . . [and thus, t]he Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.")

A factual dispute is material when it "might affect the outcome of the suit under the governing law," and genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. The non-moving party "need not match, item for item, each piece of evidence proffered by the movant," but must simply present more than a "mere scintilla" of evidence on which a jury could reasonably find for

the non-moving party. <u>Boyle v. Cty. of Allegheny Pennsylvania</u>, 139
F.3d 386, 393 (3d Cir. 1998) (quoting <u>Anderson</u>, 477 U.S. at 252).

## IV. DISCUSSION

### A. Qualified Immunity

Qualified immunity is an affirmative defense that "shields
government officials from civil damages liability unless the
official violated a statutory or constitutional right that was
clearly established at the time of the challenged conduct." <u>Taylor
v. Barkes</u>, 135 S. Ct. 2042, 2044 (2015) (quoting <u>Reichle v.
Howards</u>, 132 S. Ct. 2088, 2093 (2012)). Qualified immunity will
not, however, act as a shield for "the official who knows or should
know he is acting outside the law." <u>Noble v. City of Camden</u>, 112
F. Supp. 3d 208, 225 (D.N.J. 2015) (quoting <u>Butz v. Economou</u>, 438
U.S. 478, 506–07 (1978)). To overcome qualified immunity, the Court
must decide whether the facts alleged, taken in a light most
favorable to the plaintiff, make out: (1) a violation of a
constitutional right; and (2) that the constitutional right at
issue was "clearly established" at the time of a defendant's
alleged misconduct. <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001).

Although the question of qualified immunity is generally a
question of law, "a genuine issue of material fact will preclude
summary judgment on qualified immunity." <u>Giles v. Kearney</u>, 571
F.3d 318, 326 (3d Cir. 2009); <u>see also</u> <u>Curley v. Klem</u>, 298 F.3d
271, 278 (3d Cir. 2002) (noting that "a decision on qualified

immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis"). In other words, the Court must deny summary judgment if, on a plaintiff's version of the facts, defendants violated the plaintiff's clearly established constitutional rights.

**B.    Unlawful Search Claims**

1.    *Terry* stops and the Fourth Amendment

The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV. In general, "warrantless searches are presumptively unreasonable." Horton v. California, 496 U.S. 128, 133 (1990). However, there are limited situations which present exceptions to this general rule. One such exception is a Terry "stop and frisk." See Terry, 392 U.S. at 20–22 (1968). Under Terry and its progeny, and consistent with the Fourth Amendment, an officer may conduct a brief investigatory stop when they have reasonable, articulable, and individualized suspicion that criminal activity is afoot. United States v. Lowe, 791 F.3d 424, 434 (3d Cir. 2015). When assessing whether reasonable suspicion exists, courts consider "the totality of the circumstances – the whole picture." United States v. Cortez, 449 U.S. 411, 417 (1981).

Since Terry, the Supreme Court has "firmly rejected the argument 'that reasonable cause for a[n investigative stop] can only be based on the officer's personal observation, rather than

on information supplied by another person.'" <u>Navarette v. California</u>, 572 U.S. 393, 397 (2014) (quoting <u>Adams v. Williams</u>, 407 U.S. 143, 147 (1972)).

When police officers rely in part on tips from anonymous informants to establish reasonable articulable suspicion, as here, the "Supreme Court has made clear that 'an informant's veracity, reliability and basis of knowledge . . . are highly relevant in determining the value of his report." <u>United States v. Torres</u>, 534 F.3d 207, 210 (3d Cir. 2008) (internal citations omitted). For example, an anonymous tip can exhibit "sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop" when police officers corroborate a tipster's specific and predictive information about a subject and their movements. <u>Alabama v. White</u>, 496 U.S. 325, 327 (1990) (sustaining an investigatory stop where officers corroborated an anonymous caller's specific and predictive information about the movements of an individual allegedly transporting cocaine). On the other hand, anonymous telephone tips that include only "an accurate description of a subject's readily observable location and appearance" are, on their own, insufficient to establish reasonable articulable suspicion. <u>Florida v. J.L.</u>, 529 U.S. 266, 268-272 (2000) (ruling that an anonymous caller's tip that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun" was insufficient to establish reasonable

suspicion because "[a]ll the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about [the subject]").

The Third Circuit, taking these principles into account, considers five-factors when assessing the reliability of a tip and its propensity to establish reasonable articulable suspicion:

> (1) The tip information was relayed from the informant to the officer in a face-to-face interaction such that the officer had an opportunity to appraise the witness's credibility through observation.
>
> (2) The person providing the tip can be held responsible if her allegations turn out to be fabricated.
>
> (3) The content of the tip is not information that would be available to any observer.
>
> (4) The person providing the information has recently witnessed the alleged criminal activity.
>
> (5) The tip predicts what will follow, as this provides police the means to test the informant's knowledge or credibility.

Torres, 534 F.3d at 211 (citing United States v. Brown, 448 F.3d 239, 244 (3d Cir. 2006) (citations and internal quotation marks omitted)). Other pertinent factors include "[the p]resence of a suspect in a high crime area," "[a] suspect's presence on a street at a late hour," "[a] suspect's nervous, evasive behavior, or flight from police," and a suspect's behavior "that conforms to police officers' specialized knowledge of criminal activity." Id. (quoting Brown, 448 F.3d at 251).

2. <u>Plaintiff's unlawful search claims</u>

Plaintiff alleges that Detective Mercuri and Officer Lung violated his Fourth Amendment rights when they subjected him to an unlawful search. (Compl. at ¶ 46.) To that end, Plaintiff points to two possible Fourth Amendment violations: (1) the unlawful **initiation** of a <u>Terry</u> stop without reasonable articulable suspicion; and (2) the unlawful **execution** of the <u>Terry</u> stop (<u>i.e.</u>, the manipulation of Plaintiff's pocket after he was deemed to be unarmed). (<u>See</u> Pl.'s Opp'n Br. [Docket Item 50-6] at 10-14.) The Court addresses each in turn.

3. <u>Detective Mercuri is not entitled to qualified immunity on the initiation of an unconstitutional pat-down claim and summary judgment is inappropriate for that claim</u>

a. *Deprivation of a constitutional right*

With respect to Detective Mercuri and the initial pat-down, Plaintiff argues that Mercuri did not have reasonable articulable suspicion to initiate a <u>Terry</u> stop. (Pl.'s Opp'n Br. [Docket Item 50-6] at 10-11.) Although Plaintiff and Defendants have two different accounts of what transpired in the moments leading up to the stop and frisk, the Court must adopt Plaintiff's version of events for the purpose of the pending motions. Under this version of events, a reasonable jury could find that Detective Mercuri illegally conducted the pat-down by relying **solely** on an anonymous cell phone tip indicating that someone matching Plaintiff's

description was selling drugs in the Market, without independently corroborating any details on his own.[6] See <u>J.L.</u>, 529 U.S. at 268-272. Thus, on this record, material issues of fact exist as to whether Detective Mercuri had reasonable articulable suspicion to conduct the pat-down.

b. *Clearly established right*

Having determined that a reasonable jury could find that Detective Mercuri lacked reasonable articulable suspicion to initiate the pat-down, the Court next considers whether Plaintiff's constitutional right at issue was previously established. "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." <u>Taylor</u>, 135 S. Ct. at 2044 (quoting <u>Reichle</u>, 132 S. Ct. at 2093)); <u>see also</u> <u>Spady v. Bethlehem Area Sch. Dist.</u>, 800 F.3d 633, 637 n.4 (3d Cir. 2015) (holding that a district court "may not deny a summary judgment motion premised on qualified immunity without deciding that the right in question was clearly established at the time of the alleged wrongdoing") (citation omitted).

In February 2015, the law was well-established that police officers may not conduct a <u>Terry</u> stop and frisk without reasonable

---

[6]    The Court expresses no view on the merits nor any prediction whether Plaintiff is likely or unlikely to prove these facts at trial.

articulable suspicion. More specifically, it was well-established that reasonable articulable suspicion is not established where police officers act solely based on an anonymous telephone tip that only contains a description of a subject's readily observable location and appearance and an uncorroborated allegation of drug-dealing. See J.L. 529 U.S. at 272 ("An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person."); United States v. Roberson, 90 F.3d 75, 80 (3d Cir. 1996) ("[W]e hold that the police do not have reasonable suspicion for an investigative stop when, as here, they receive a fleshless anonymous tip of drug-dealing that provides only readily observable information, and they themselves observe no suspicious behavior.").

Adopting Plaintiff's version of the events, as the Court must do, the undersigned finds that an objectively reasonable officer would have known that conducting a Terry stop based solely on an anonymous telephone tip containing a subject's readily observable location and appearance, along with an uncorroborated allegation of drug-dealing, is unlawful and constitutes an unreasonable

search under the Fourth Amendment. Accordingly, the Court concludes that Detective Mercuri is not entitled to qualified immunity at this time.[7]

c. *Summary judgment*

The Court also denies Detective Mercuri's motion for summary judgment on Plaintiff's claims of an unconstitutional initiation of a <u>Terry</u> stop. As noted above, there is a genuine dispute as to whether the <u>Terry</u> stop was based solely on the anonymous tip and, viewing the facts in the light most favorable to Plaintiff, a reasonable jury could conclude that Detective Mercuri lacked reasonable articulable suspicion when he searched Plaintiff. Therefore, summary judgment is not warranted on this claim against Defendant Mercuri.

---

[7]     Because the question of qualified immunity is ultimately a question for the Court, this conclusion may change based on the facts found by the jury at trial. <u>Curley</u>, 499 F.3d at 214 ("The jury was not bound at trial, and the District Court was not bound post-trial, by our earlier statements involving a hypothetical set of facts favoring Curley, since the facts and inferences actually found by the jury were clearly different than those which we were required to posit in <u>Curley</u> when considering the summary judgment order.").

4. <u>Detective Mercuri is not entitled to qualified immunity on the execution of an unconstitutional pat-down claim and summary judgment is inappropriate for that claim</u>

a. *Bounds on the execution of a Terry stop*

Having previously discussed the prerequisites for the **initiation** of a Terry stop, the Court will now address the bounds on the **execution** of a Terry search and its applicability to the facts of this case. Because the brief, investigatory stop allowed by Terry is based on reasonable suspicion rather than probable cause, the search itself must be "limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." Terry 392 U.S. at 26; see also Adams, 407 U.S. at 146 ("The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence.").

Although the primary objective of a Terry search is protective, circumstances exist whereby police officers "may seize contraband detected during the lawful execution of a Terry search." Minnesota v. Dickerson, 508 U.S. 366, 374 (1993). One such circumstance is covered by the "plain view" doctrine. See id. at 375 ("[I]f police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant. If, however, the police lack

probable cause to believe that an object in plain view is contraband without conducting some further search of the object – i.e., if its incriminating character is not immediately apparent – the plain-view doctrine cannot justify its seizure.") (internal citations and quotations omitted).

An offshoot of this doctrine, often referred to as "plain feel," deals with situations where officers feel contraband during a Terry stop. In Dickerson, for example, the Supreme Court explained that it was permissible for officers to seize contraband during a protective search as long as the search stays within the bounds delineated by Terry. Id. at 373. In that case, an officer conducted a Terry stop that revealed no weapons. Id. at 369. However, the officer continued to search the subject's jacket after taking an interest in a small lump in his pocket. Id. The officer subsequently determined that the lump was contraband after "squeezing, sliding and otherwise manipulating" the contents of the pocket. Id. at 378 (internal quotation marks omitted). Accordingly, the search was ruled inconsistent with Terry and the "plain feel" doctrine because the officer had already determined that the subject was unarmed and the "incriminating character of the object was not immediately apparent to [the officer]." Id. at 379.

The appropriate question under Dickerson, therefore, "is not the immediacy and certainty with which an officer knows an object

to be contraband or the amount of manipulation required to acquire that knowledge, but rather what the officer believes the object is by the time he concludes that it is not a weapon." United States v. Yamba, 506 F.3d 251, 258 (3d Cir. 2007). Keeping with the purpose and rationale of Terry, an officer "is allowed to slide or manipulate an object in a suspect's pocket, consistent with a routine frisk, until the officer is able reasonably to eliminate the possibility that the object is a weapon." Id. at 259. If the officer believes the object is contraband before determining it is not a weapon, the officer can conduct a more intrusive search and ultimately seize the contraband, if any is found. Id. On the other hand, an officer who determines that a subject is unarmed but still proceeds to manipulate one's outer clothing to determine whether an object is contraband exceeds the bounds of Terry and violates the Fourth Amendment. See Dickerson, 508 U.S. at 379.

> b.   *Deprivation of a constitutional right*

Once again, the Court must adopt Plaintiff's version of the facts for the qualified immunity analysis. The version of facts most favorable to Plaintiff is that Detective Mercuri determined that Plaintiff was unarmed during the initial pat-down but returned to Plaintiff's pocket and manipulated its contents by squeezing and manipulating the pocket approximately four times to determine whether the object inside was contraband. Given these facts, a reasonable jury could conclude that Detective Mercuri overstepped

the bounds of Terry by unreasonably manipulating Plaintiff's pocket. Therefore, the Court finds that material issues of fact exist as to whether Detective Mercuri's execution of the Terry stop was unreasonable and, therefore, violated Plaintiff's Fourth Amendment rights.

c.    *Clearly Established Right*

The Court next considers whether Plaintiff's constitutional right at issue was previously established. As discussed above, in February 2015, the law was well-established that police officers may not manipulate an object in a subject's pocket to determine its character after initially determining that the subject is unarmed. See Dickerson, 508 U.S. at 379 ("[T]he officer's continued exploration of respondent's pocket after having concluded that it contained no weapon was unrelated to the sole justification of the search under Terry" and is therefore unconstitutional) (internal citations, quotation marks and brackets omitted); Yamba, 506 F.3d at 259 (describing that if an officer goes beyond what is necessary to determine that a suspect is armed the search is no longer valid under Terry); see also  United States v. Mattarolo, 209 F.3d 1153, 1158 (9th Cir.2000) ("Had the officer continued to manipulate the object beyond what was necessary to ascertain that it posed no threat, he would have run afoul of the Supreme Court's holding in . . . Dickerson."). Adopting Plaintiff's version of facts, an objectively reasonable officer would have known that it is unlawful

to continue to manipulate the contents of a subject's pocket to ascertain an object's character after previously determining that the subject is unarmed. Therefore, the Court concludes that Detective Mercuri is not entitled to qualified immunity on this claim.

### d. *Summary Judgment*

Detective Mercuri's motion for summary judgment on Plaintiff's claim of an unconstitutional execution of the <u>Terry</u> stop is likewise denied. Again, there is a material dispute as to whether Detective Mercuri continued to manipulate the object in Plaintiff's pocket to ascertain its character even after determining that Plaintiff was unarmed. Since a reasonable jury could credit Plaintiff's version of the facts, summary judgment is inappropriate.

### 5. <u>Officer Lung is entitled to summary judgment on all unlawful search claims against him</u>

Plaintiff concedes that Defendant Lung was unable to actually search his pocket because Plaintiff prevented him from doing so, and that Lung did not himself initiate or conduct the pat-down of Plaintiff. (<u>See</u> Pl.'s RSMF [Docket Item 32-1] at ¶ 12; <u>see generally</u> Pl.'s Opp'n Br. [Docket Item 32-2].) Rather, Plaintiff's opposition brief singles out Detective Mercuri as the individual responsible for the pat-down and the video evidence corroborates this account. (<u>See generally</u> Pl.'s Opp'n Br. [Docket Item 32-2] at

5-8.) Moreover, Plaintiff does not plead an alternative theory of liability with regards to Officer Lung's conduct, such as failure to intervene. <u>See</u>, <u>e.g.</u>, <u>Hartman v. Gloucester Twp.</u>, 2014 WL 2773581, at *14 (D.N.J. June 19, 2014) ("To make out a prima facie case of failure to intervene, a plaintiff must prove that an officer had a duty to intervene, the officer had a realistic and reasonable opportunity to intervene, and that the officer failed to intervene") (citing <u>Smith v. Mensinger</u>, 293 F.3d 641, 650–51 (3d Cir. 2002)). On this record, the Court finds as a matter of law that no reasonable jury could find Defendant Lung unlawfully searched Plaintiff and he is, therefore, entitled to summary judgment on those claims. <u>See</u> <u>Hayward v. Salem City Bd. of Educ.</u>, 2016 WL 4744132, at *4 (D.N.J. Sept. 12, 2016) (explaining that, in the summary judgment context, "[b]ecause it is undisputed that [the defendant] did not conduct the strip search himself, his Fourth Amendment liability can only arise from failing to intervene").

**C. Excessive Force Claims**

1. <u>Excessive force</u>

"To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." <u>Brower v. County of Inyo</u>, 489 U.S. 593, 599 (1989), <u>quoted in</u> <u>Abraham v. Raso</u>, 183 F.3d 279, 288 (3d Cir. 1999); <u>see also</u> <u>Graham v. Connor</u>, 490 U.S.

386, 395 (1989) ("[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."). "The use of excessive force is itself an unlawful 'seizure' under the Fourth Amendment." Couden v. Duffy, 446 F.3d 483, 496 (3d Cir. 2006). The parties do not dispute that a seizure occurred here.

To determine the reasonableness of a seizure, the court asks whether the officer's conduct was "objectively reasonable" in light of the totality of the circumstances, without regard to the underlying intent or motivation. Graham, 490 U.S. at 397 (citing Terry v. Ohio, 392 U.S. 1, 21 (1968)); Kopec v. Tate, 361 F.3d 772, 776 (3d Cir. 2004). The "objective reasonableness" inquiry requires an examination of the "facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. Additional factors include "the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police

officers must contend at one time." Rivas v. City of Passaic, 365
F.3d 181, 198 (3d Cir. 2004) (quoting Sharrar v. Fising, 128 F.3d
810, 822 (3d Cir. 1997)). In the Third Circuit, courts take into
account "all of the relevant facts and circumstances leading up to
the time that the officers allegedly used excessive force." Rivas,
365 F.3d at 198 (citing Abraham v. Raso, 183 F.3d 279, 291 (3d
Cir. 1999)). The Court should not apply "the 20/20 vision of
hindsight," but should instead consider the "perspective of a
reasonable officer on the scene." Id.; see also Kopec, 361 F.3d at
777.

### 2.   Plaintiff's excessive force claims

Plaintiff alleges that Detective Mercuri and Officer Lung
violated his constitutional rights when they used excessive force
during the struggle. (Compl. at ¶¶ 46, 49.) Plaintiff's argument
focuses primarily on the deployment of the K-9 by Detective
Mercuri. (See Pl.'s Opp'n Br. [Docket Item 32-2] at 9; Pl.'s Opp'n
Br. [Docket Item 50-6] at 10-14.) However, Plaintiff also argues
that Officer Lung's involvement in the encounter constitutes
excessive force. (Pl.'s Opp'n Br. [Docket Item 32-2] at 9-10). The
Court addresses the claims against each defendant in turn.

3. <u>Detective Mercuri is not entitled to qualified immunity on the excessive force claim involving the K-9, and summary judgment on that claim is not warranted</u>

a. *Deprivation of a Constitutional Right*

Plaintiff primarily bases his excessive force claim against Detective Mercuri on the deployment of the K-9 during the struggle. (Pl.'s Opp'n Br. [Docket Item 50-6] at 9-10.) Under Plaintiff's version of events, Detective Mercuri first ordered the K-9 to make an apprehension while Plaintiff was lying face down on the ground with two officers on top of him, but the K-9 mistakenly attacked Officer Lung. Then, while Plaintiff remained stationary, Detective Mercuri ordered the K-9 to attack Plaintiff again. Detective Mercuri continued to allow the K-9 to bite Plaintiff's leg while Plaintiff stood with his hands in the air.[8] Given these facts, a reasonable jury could find that Defendant Mercuri's use of the K-9 at various points was disproportionate to the threat Plaintiff posed to the officers, if any, and unnecessary to effectuate his

---

[8] Plaintiff emphasizes that only twenty-eight seconds transpired from the first attempt at subduing Plaintiff to the deployment of the K-9. (Pl.'s Opp'n Br. [Docket Item 50-6] at 9; <u>see also</u> Market Video at 12:11:50-12:12:18.) And only nine seconds separated the start of the struggle and Detective Mercuri's departure from the group to retrieve the K-9. (Market Video at 12:11:50-12:11:59.) Moreover, Detective Mercuri did not use a leash when he first retrieved the K-9 from his police vehicle. (Lung MVR at 11:14:53-11:14:56.)

arrest.[9] Accordingly, a jury could reasonably conclude that Detective Mercuri's use of the K-9 was unreasonable. See e.g., Stadler v. Abrams, 2018 WL 3617967, at *1 (D.N.J. July 30, 2018) (case where jury found that an officer's use of K-9 against subject constituted excessive force).

b. *Clearly Established Right*

Having determined that a jury could find that the Detective Mercuri's use of force was unreasonable, the Court next considers whether Plaintiff's constitutional right at issue was clearly established. In February 2015, the law was well-established that police officers may not use serious force on a suspect who is not actively resisting arrest or no longer poses a direct threat to officers or public safety, even if the suspect posed a threat at the time force was initiated on them. See Lamont v. New Jersey, 693 F.3d 177, 184 (3d Cir. 2011) ("Even where an officer is initially justified in using force, he may not continue to use such force after it has become evident that the threat justifying the force has vanished."); Lytle v. Bexar County, Tex., 560 F.3d 404, 413 (5th Cir. 2009) ("[A]n exercise of force that is reasonable at one moment can become unreasonable in the next if

---

[9] Although Plaintiff concedes that he initially resisted the efforts of the officers, there is a dispute as to whether he was resisting at the time Detective Mercuri deployed the K-9. See Couden, 446 F.3d at 497 (finding excessive force as a matter of law where plaintiff was not "resisting arrest or attempting to flee" at the "time the force was used").

the justification for the use of force has ceased"); see also Alicea v. Thomas, 815 F.3d 283, 288 (7th Cir. 2016) (stating that the use of force "is only reasonable when it is proportional to the threat posed. If an officer's threat perception changes, so too should her force calculus.")

This principle was also clearly established in dog bite cases. See Campbell v. City of Springboro, 700 F.3d 779, 789 (6th Cir. 2012) (denying qualified immunity to an officer who "allowed a 'bite and hold' dog, whose training was questionable, to attack two suspects who were not actively fleeing and who, because of proximity, showed no ability to evade police custody"); Watkins v. City of Oakland, 145 F.3d 1087, 1093 (9th Cir. 1998) (holding that it was "clearly established that excessive duration of the bite and improper encouragement of a continuation of the attack by officers could constitute excessive force that would be a constitutional violation"); Castellani v. City of Atl. City, 2017 WL 3112820, at *15 (D.N.J. July 21, 2017) (finding that an officer who deployed a dog on a suspect who was already subdued by five officers had violated a clearly established right and was not entitled to qualified immunity). For these reasons, Detective Mercuri is not entitled to qualified immunity as to Plaintiff's excessive force claims against him involving the K-9.

c.   *Summary Judgment*

The Court also denies Detective Mercuri's motion for summary judgment on Plaintiff's excessive force claim against him. As discussed above, viewing the facts in the light most favorable to Plaintiff, a reasonable jury could conclude that Detective Mercuri used excessive force when he deployed the K-9 while Plaintiff was on the ground and then again while Plaintiff was standing in the store. In both instances, a reasonable jury could determine that, at the time the K-9 was deployed, Plaintiff was no longer a threat to the officers, resisting their attempts at making an arrest, or evading them. Accordingly, a reasonable jury could find that the force used by Detective Mercuri was excessive and summary judgment will be denied as to this claim.

4.   <u>Officer Lung is entitled to summary judgment with respect to all excessive force claims against him</u>

With respect to Defendant Lung, Plaintiff concedes that he blocked Lung's initial attempt to search his pocket after Detective Mercuri's pat-down, and that he "resist[ed] the attempts" of the officers, including Lung, to bring him to the ground after the search. (Pl.'s RSMF [Docket Item 50-7] at ¶¶ 29-30.)[10] Still,

_____

[10]   At his deposition, Plaintiff described his actions at the start of the struggle:

Q. What were you physically doing with your body?

A. I would say to the point to where – when they were gripping me up and I asked them to take their hands off

32

Plaintiff argues that issues of material fact exist as to the force used by Officer Lung and that a jury should decide them. (Pl.'s Opp'n Br. [Docket Item 32-2] at 9) But the bulk of Plaintiff's argument focuses on the use of the K-9 under Detective Mercuri's control, as discussed above, rather than Officer Lung's conduct. (Id.) Plaintiff, for example, does not argue that Officer Lung used excessive force when he brought Plaintiff to the ground. See id. at 9-10.

Officer Lung, meanwhile, argues that the force he employed was only the amount necessary to overcome Plaintiff's physical resistance and to effectuate the arrest. (Def. Lung's Br. [Docket Item 31-1] at 10.) In support of this position, Officer Lung states that his actions were consistent with the New Jersey Attorney General's Use of Force policy. (See N.J. Att'y Gen. Use of Force Policy [Docket Item 31, Ex. P] at 3) (describing that physical force including "wrestling a resisting subject to the ground" and "striking with the hands or feet" is appropriate when "necessary to overcome a subject's physical resistance to the exertion of the law enforcement officer's authority."). Officer Lung further argues that New Jersey law does not permit a citizen "to resist arrest by one he knows or has good reason to believe is an

---

me, I would say – I was – if you want to say it's resisting, that's what I was doing like.

(Smith Dep. 86:6-12; see also Market Video at 12:11:50.)

authorized police officer engaged in the performance of his duties, whether or not the arrest is illegal under the circumstances obtaining." State v. Mulvihill, 57 N.J. 151, 155 (1970) (citing State v. Koonce, 89 N.J. Super. 169, 184 (App. Div. 1965)).

The video clearly shows (see Market Video at 12:11:40), and Plaintiff concedes (see Pl.'s RSMF [Docket Item 50-7] at ¶¶ 29-30), that Plaintiff blocked Officer Lung's attempted search of Plaintiff's pocket and that Plaintiff resisted Officer Lung's attempts to subdue him. Moreover, the video shows that Plaintiff dragged Officers Lung and Hesson across the sidewalk, and in and out of the Market, during the course of the struggle. (Market Video at 12:11:54-12:12:17.) After carefully reviewing the videos and additional evidence in the record, the Court concludes that no reasonable fact-finder could find that Officer Lung's use of force was excessive. See, e.g., Brown v. City of Jersey City, 2015 WL 586022, at *5 (D.N.J. Feb. 10, 2015), aff'd in part, Brown v. Makofka, 644 F. App'x 139 (3d Cir. 2016) ("A plaintiff who actively resists arrest, in the manner Plaintiff demonstrated on video (folding his hands and grasping his vest to prevent the Officers from handcuffing him), exposes himself to the possibility that some amount of force may be used against him to effectuate that arrest."). Therefore, Officer Lung's motion for summary judgment shall be granted as to the issue of excessive force.

### D. Malicious Prosecution Claims

Detective Mercuri also moves for summary judgment on Plaintiff's malicious prosecution claim. (Def. Mercuri's Br. [Docket Item 46-5] at 28; Def. Mercuri's Reply Br. [Docket Item 57] at 5.) To prevail on a malicious prosecution claim under 42 U.S.C. § 1983, a plaintiff must demonstrate that: (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding was terminated in the plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice, and (5) the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding. Johnson v. Knorr, 477 F.3d 75, 82 (3d Cir. 2007).

Detective Mercuri is entitled to summary judgment on this claim because Plaintiff is unable to meet the third element, since the Third Circuit has held that a grand jury indictment or presentment "constitutes prima facie evidence of probable cause to prosecute." Rose v. Bartle, 871 F.2d 331, 353 (3d Cir. 1989). As noted above, Plaintiff was indicted by a grand jury on charges of Resisting Arrest (Third Degree) and Aggravated Assault of a Law Enforcement Officer. (Grand Jury Indictment at 11-12.) Moreover, while "prima facie evidence may be rebutted by evidence that the presentment was procured by fraud, perjury or other corrupt means," Plaintiff does not present any such evidence here. Rose, 871 F.2d

at 353. Accordingly, summary judgment is appropriate for Detective Mercuri on the malicious prosecution claim.

### E.    Punitive Damages

Detective Mercuri further argues that, based on the evidence in the record, he is entitled to summary judgment on Plaintiff's claims for punitive damages. (Def. Mercuri's Br. at 29.) Under 42 U.S.C. § 1983 and New Jersey's Punitive Damages Act, N.J.S.A. 2A:15-5.12, a defendant whose conduct is motivated by evil motive or demonstrates a reckless disregard toward others' rights may be subjected to punitive damages. See Smith v. Wade, 461 U.S. 30, 56 (1983) (a jury may award punitive damages when a "defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others"); see also N.J.S.A. 2A:15-5.12(a). Thus, as the Court of Appeals has explained:

> [F]or a plaintiff in a section 1983 case to qualify for a punitive award, the defendant's conduct must be, at a minimum, reckless or callous. Punitive damages might also be allowed if the conduct is intentional or motivated by evil motive, but the defendant's action need not necessarily meet this higher standard. This point is made clear by the Supreme Court's language in Wade: "[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."

Savarese v. Agriss, 883 F.2d 1194, 1204 (3d Cir. 1989) (internal citation omitted); see also Kounelis v. Sherrer, 529 F.Supp.2d 503, 534 (D.N.J. 2008).

On this record, the Court finds that a jury could find that Detective Mercuri's deployment of the K-9 demonstrated, at least, a reckless indifference toward Plaintiff's constitutional rights. See Kounelis, 529 F.Supp.2d at 534. Moreover, should the jury also find that Detective Mercuri lacked reasonable articulable suspicion to conduct a Terry stop or overstepped the bounds of Terry while executing the pat-down, and that he engaged in the seizure and use of force in question rashly and with a disregard for the limitations the Fourth Amendment imposes, that same jury could impose punitive damages without finding personal animus or enmity. See Savarese, 883 F.2d at 1204. Thus, the Court will deny Detective Mercuri's motion for summary judgment as to Plaintiff's claim for punitive damages on these claims.

## V. CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Detective Mercuri's motion for summary judgment and grant Officer Lung's motion for summary judgment in its entirety. The accompanying Order will be entered.


**July 24, 2019_**                    **s/ Robert B. Kugler_____**
Date                                  ROBERT B. KUGLER
                                      U.S. District Judge